EFiled:  May 28 2020 04:36PM EDT
Transaction ID 65662949
Case No. 2020-0415-

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ST. PAUL ELECTRICAL CONSTRUCTION PENSION PLAN, ST. PAUL ELECTRICAL CONSTRUCTION WORKERS SUPPLEMENTAL PENSION PLAN (2014 RESTATEMENT) and RETIREMENT MEDICAL FUNDING PLAN FOR THE ST. PAUL ELECTRICAL WORKERS, | § § § § § | |
| | § | C.A. No.: 2020-___-___ |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| ERNEST GARCIA III, ERNEST GARCIA II, ERNEST GARCIA III MULTIGENERATIONAL TRUST III, ERNEST IRREVOCABLE 2004 TRUST III, ECG II SPE, LLC, VERDE INVESTMENTS, INC., MICHAEL MAROONE, NEHA PARIKH, IRA PLATT, JAMES D. QUAYLE, and GREGORY SULLIVAN, | § § § § § § | |
| | § | |
| Defendants, | § | |
| | § | |
| -and- | § | |
| CARVANA CO., | | |
| Nominal Defendant. | | |

## <u>VERIFIED CONSOLIDATED DERIVATIVE COMPLAINT</u>

Plaintiffs St. Paul Electrical Construction Pension Plan, St. Paul Electrical

Construction Workers Supplemental Pension Plan (2014 Restatement), and

Retirement Medical Funding Plan for the St. Paul Electrical Workers (collectively,

"Plaintiffs"), by and through their undersigned counsel, submit this Verified Consolidated Derivative Complaint (the "Complaint"), upon knowledge as to themselves and their own actions and, as to all other matters, upon information and belief derived from the investigation of counsel, which included review of filings with the United States Securities and Exchange Commission ("SEC") and other publicly available documents concerning Carvana Co. ("Carvana" or the "Company") and allege as follows:

## INTRODUCTION

1.     This stockholder derivative action challenges a controlled company's decision to issue millions of shares to its controllers at a bargain-basement price. This issuance enriched the controllers while cheating the Company out of millions of dollars of fair value for the shares.

2.     Carvana is a leading e-commerce platform, selling used automobiles through the internet rather than through brick-and-mortar dealerships. Its primary selling point is the ease, speed, and transparency of the car-buying process; for example, its most recognizable symbol is the 7-story coin-operated car vending machines it has installed in about two dozen cities.

3.     Carvana is controlled by the Garcia family. Its CEO, Chairman, and President, Ernest Garcia III ("Garcia III"), is the son of used car mogul Ernest Garcia II ("Garcia II"), an ex-felon who amassed a fortune by selling cars and financing

2

packages to individuals with poor credit.  Garcia II and Garcia III control more than 92% of Carvana's voting power.

4.     Since its 2017 IPO, Carvana has grown at an astonishing rate.  In 2018 and 2019, its total revenue grew 131% and 95%, respectively.  But in the spring of 2020, the COVID pandemic wreaked havoc on Carvana's stock prices (along with the prices of almost all publicly traded stocks).  Against the backdrop of historic market dislocations, Carvana's stock hit an artificial trough that did not reflect the reality of Carvana's continued strong performance.  As was eventually disclosed with Carvana's Q1 2020 results, the Company had continued to perform well despite the COVID pandemic.  Indeed, Carvana was and is well placed to accommodate an anxious public concerned with the spread of a dangerous disease, as its primary competitive advantage and main selling point has always been that individuals can evaluate, choose, purchase, and receive their cars from their homes.

5.     While Carvana was trading in this artificial trough, insiders used their knowledge of the Company's actual performance—before the results of that quarter were published—to take a larger chunk of the Company on the cheap.  They did so through a share offering in which only they and their chosen investors could participate.

6.     Despite knowing that the Company was well positioned to weather the storm, the controllers caused, and the Board of Directors ("Board") permitted, a self-

3

dealing transaction that was designed to – and had the effect of – benefitting the controllers at the Company's expense.  By selling Carvana shares to the Company's controlling stockholders for a bargain-basement price, Defendants robbed the Company of tens and perhaps *hundreds* of millions of dollars of capital.  Revealing the inequity of the timing and price of the offering, within weeks of the offering Carvana made a second offering on May 22, 2020, and sold 5 million shares to the public for *more than double* what the controllers paid.  Plaintiffs seek to recover the substantial harm caused to Carvana by the sale of a substantial chunk of the Company to its controllers at an unfair, bargain basement price.

## THE PARTIES

### A.   PLAINTIFFS

7.     St. Paul Electrical Construction Pension Plan is a current Class A stockholder of Carvana and has continuously been a Class A stockholder of the Company at all times relevant to this action.

8.     St. Paul Electrical Construction Workers Supplemental Pension Plan (2014 Restatement) is a current Class A stockholder of Carvana and has continuously been a Class A stockholder of the Company at all times relevant to this action.

4

9.     Retirement Medical Funding Plan for the St. Paul Electrical Workers is a current Class A stockholder of Carvana and has continuously been a Class A stockholder of the Company at all times relevant to this action.

### B.     NOMINAL DEFENDANT CARVANA

10.     Nominal Defendant Carvana is a Delaware corporation headquartered in Phoenix, Arizona.  Carvana's Class A common shares are traded on the NYSE under the ticker "CVNA."  Carvana sells used cars through an online e-commerce platform.  Carvana is dominated and controlled by the Garcia family, including Carvana's founder (who is also the CEO and Chair of the Board), his father (the stockholder with the greatest voting power), and entities they control.  Article Twelve of the Company's Amended and Restated Certificate of Incorporation, effective as of April 27, 2017 ("Certificate of Incorporation") provides that this Court shall be the "sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, [and] (ii) any action asserting a claim for breach of fiduciary duty owed by any director, officer, employee or stockholder of the Corporation to the Corporation . . . "  The Certificate of Incorporation also indicates that "[a]ny Person purchasing or otherwise acquiring or holding any interest in shares of capital stock of the Corporation (including, without limitation, shares of Common Stock) shall be deemed to have notice of and to have consented to the provisions of this ARTICLE TWELVE."

5

## C. THE GARCIA PARTY DEFENDANTS

11.     Defendant Ernest C. Garcia III ("Garcia III") is the Company's founder and CEO.  Garcia III has been Carvana's CEO and the Chairman of its Board since the Company's inception.  Before launching Carvana, Garcia III worked for his father's company, DriveTime Automotive Group Inc. ("DriveTime"), as a Treasurer, VP and Director-Quantitative Analytics.  Before the stock offering that is the subject of this suit, Garcia III held 11,952[1] Class A shares and 3,664,526 Class B shares; assuming all of his LLC units in Carvana's subsidiary were exchanged for Class A shares, Garcia III would have held about 10% of the Class A shares at the time of the offering.  Together with Garcia II and their trusts, Garcia III controlled 93% of the voting power of the Company at the time of the stock offering that is the subject of this suit.

12.     Defendant Ernest C. Garcia II ("Garcia II") is Garcia III's father.  Like his son, Garcia II is a billionaire used car businessman.  As of April 1, 2020, Garcia II beneficially owned 57.4% of Carvana's Class A shares.[2]  He holds 52,937,458 Class B shares.  Garcia II also owns 66,171,823 Class A Units in Carvana Group (defined below).  With his son and the trusts they control, Garcia II controlled 93%

---

[1] This figure gives effect to the April 1, 2020 withholding of 79 shares as the result of taxes on restricted stock units that had vested.

[2] This percentage (representing 85,379,035 Class A shares) assumes exchange of all of his Class A common units into Class A shares.

of the voting power of the Company at the time of the stock offering that is the subject of this suit.

13. Defendant Ernest Garcia III Multi-Generational Trust III ("Multigenerational Trust") is a trust over which Garcia II has sole investment and depository power. Garcia III and his children are the sole beneficiaries of the Multigenerational Trust. The Multigenerational Trust beneficially owns 100,000 Class A shares and 11,952,000 Class B shares as of April 1, 2020. It also holds 14,940,000 Class A Units in Carvana Group (defined below).

14. Defendant Ernest Irrevocable 2004 Trust III ("2004 Trust") is a trust over which Garcia II has investment and depository power. Garcia III is the sole beneficiary of the 2004 Trust. The 2004 Trust beneficially owns 11,834,021 Class B shares. It holds 14,792,526 Class A Units in Carvana Group (defined below).

15. Defendant ECG II SPE, LLC ("SPE"), an Arizona entity, is a limited liability company that is wholly owned and controlled by Garcia II. SPE holds 8,000,000 Class B shares, as well as 10,000,000 Class A Units in Carvana Group (defined below), for which Garcia II is the beneficial owner.

16. Defendant Verde Investments, Inc. ("Verde"), an Arizona corporation, is an affiliate of DriveTime. Verde is wholly owned and controlled by Garcia II, who is its sole shareholder and director. Garcia II participated in the Private Offering

7

(defined below) through Verde.   Verde purchased 555,556 shares in the Private Offering; Garcia II is the beneficial owner of these shares.[3]

17.    The Garcia Parties control and dominate Carvana.

**D.    DIRECTOR DEFENDANTS**

18.    Defendant Michael Maroone ("Maroone") has been a member of the Board since the Company's 2017 IPO.  Maroone has been designated as the "Lead Director" and is a member of the Board's Audit Committee.  Before joining Carvana, Maroone was the president and chief operating officer of AutoNation Inc., from 1999 to 2015, and was a member of AutoNation's board from 2005 to 2015.  He now serves as the chief executive of Maroone USA LLC, an automotive retail group that sells used and new vehicles.  Referring to Carvana's success as an e-retailer, Maroone noted that Carvana will put "tremendous pressure on brick-and-mortar" companies like his.

19.    Defendant Ira Platt ("Platt") has been a member of the Board since the Company's 2017 IPO.  He is the Chair of the Audit Committee and also a member of the Compensation and Nominating Committee.  He is the president of Georgiana Ventures, LLC ("GV LLC"), an entity he founded in 2009.  GV LLC provides equity

---

[3] Garcia II, Garcia III, Multigenerational Trust, 2004 Trust, SPE, and Verde are collectively referred to herein as the "Garcia Parties"; Garcia II, Garcia III, and Verde are collectively referred to herein as the "Insider Trading Parties."

and debt capital to specialty finance companies, acquires portfolios of consumer finance receivables and offers consulting services to the specialty finance industry. GV LLC is the managing member of GV Auto I, LLC. GV Auto I, LLC is a unitholder in Carvana's operating subsidiary. Garcia II appointed Platt to the board of Garcia II's company, DriveTime. Platt served as a DriveTime director from February 2014 until he was traded over onto the Carvana board at the time of Carvana's IPO.

20.   Defendant Greg Sullivan ("Sullivan") has been a member of the Board since the Company's 2017 IPO. He is a member of the Audit Committee and the Chair of the Compensation and Nominating Committee. Sullivan co-founded AFAR Media in 2007 and has served as its CEO since that time. Before 2007, Sullivan held various executive positions at DriveTime, including president (1995-2004), CEO (1999-2004), and Vice Chair (2004-2007).

21.   Defendant James D. Quayle ("Quayle") has been a member of the Board since the Company's 2017 IPO, serving on the Compensation and Nominating Committees. Quayle has been the Chair of Cerberus Capital, a private investment firm, since 1999. Quayle previously held various federal government positions, most recently as Vice President of the United States from 1989 to 1993. Quayle has been associated with Garcia II since the two "struck [a] relationship" many years

ago. The Garcias have donated to the political campaigns of Quayle's son, Benjamin

Quayle, as well as to PACs led by Quayle.[4]

22.     Defendant Neha Parikh ("Parikh") has been a member of the Board

since 2019. Parikh serves on the Compensation and Nominating Committee.

23.     Garcia III, Maroone, Platt, Sullivan, Quayle, and Parikh are collectively

referred to herein as the "Director Defendants."

## I.     SUBSTANTIVE ALLEGATIONS

### A.     CONVICTED FELON GARCIA II ENTERS THE AUTO SALES BUSINESS

24.     Before entering the auto sales business, Garcia II was a real estate

developer in Tuscon, Arizona. His business cratered after he was convicted for being

a "key figure" in the Charles Keating Savings & Loan scandal.[5] In 1990, Garcia II

pleaded guilty to felony bank fraud as a result of his participation in the scandal.[6] In

---

[4] Garcia II donated $5,000 to Friends of the Majority, the beneficiary of which was
Ben Quayle, on August 12, 2012, and made a direct donation to Ben Quayle of
$2,400 on February 18, 2010. Garcia II and Garcia III both made $2,400 donations
to Ben Quayle during his general election campaign in the second half of 2010. In
1999, Garcia II donated $1,000 to Dan Quayle, as he was running for president. In
March 1998, Garcia II donated $5,000 to Campaign America, a PAC associated with
Dan Quayle. These sums were the maximum amounts an individual could give to
an individual candidate (or, in the case of Campaign America, to a PAC).

[5] James S. Granelli, *Lincoln S&L; Figure Pleads Guilty to Fraud: Crime: Ernest C.
Garcia II Admits Acting To Help The Thrift Hide Its Ownership of Some Risky
Deserve Land in Arizona*, L.A. TIMES (Oct. 31, 1990).

[6] Notably, although Garcia II is the Company's controlling shareholder, Carvana
does not disclose his history of fraud.

a related action brought against him by the SEC, Garcia II was charged with engaging in fraudulent real estate transfers. His conduct included serving as a "straw borrower," fraudulently obtaining a $30 million line of credit that also helped the savings and loan association hide its ownership of troubled desert land deals from regulators. In connection with the SEC action, Garcia II consented to an injunction barring him from future violations of federal securities laws. As the then-U.S. Attorney General noted, "This type of white-collar scheme—using 'straw borrowers'—is of particular concern because it is designed to conceal the true nature of the financial transactions involved." As a result of his conduct, Garcia II is prohibited from serving as an officer, director, or employer of any federally insured financial institution or a securities firm without government approval.

25.     After his own firm went bankrupt and he served three years on probation, Garcia II formed "Ugly Duckling." Ugly Duckling sold and financed used cars for sub-prime purchasers with poor credit histories. Garcia II took the entity public in the mid-1990s, raising $170 million through a number of offerings. Ugly Duckling traded under the "UGLY" ticker.

26.     As CEO of Ugly Duckling, Garcia II engaged in a series of self-dealing transactions (or, as Forbes cleverly put it, he "feather[ed] his own nest with Ugly

Duckling's assets").[7]  These included causing Ugly Duckling to sell 17 properties to an investor group that he then leased back and re-bought a year later—*in his personal capacity*—at a 10% discount.  He also caused Ugly Duckling to sell him one of its business units that loaned funds to other car dealerships, paying only book value.  In March 2001, Ugly Duckling stockholders filed a derivative action against Garcia II and the company's other directors[8]  challenging these and other improper transactions.  Director Defendant Sullivan was on the Ugly Duckling board at the time and was also sued for fiduciary breaches.

27.     In the Ugly Duckling derivative action, stockholders alleged that Garcia II, Sullivan, and other Ugly Duckling directors breached their fiduciary duties by permitting related-party transactions that enriched Garcia II while cheating the company out of value.[9]  The stockholders alleged that he pursued these transactions to enrich himself and to further his plans to take the company private for inadequate consideration.  Indeed, while the case was proceeding, Garcia II tried to take the company private.  The parties eventually reached a settlement, as a consequence of which Ugly Duckling was required to increase its proposed merger consideration by

---

[7] Nathan Vardi, *Feathered Nest*, FORBES (Nov. 26, 2001).

[8] *In re Ugly Duck v. Ernest C. Garcia*, C.A. No. 18746 (Del. Ch.).

[9] "The purpose of these transactions has been to enrich Garcia, to increase the percentage of the Company he owns, and to further his plans to take the Company private for inadequate consideration." *Id.* (Consol. Am. Compl., Nov. 16, 2001).

Case: 4:21-cv-01096-JCH   Doc. #: 16-11   Filed: 11/15/21   Page: 13 of 46 PageID #: 212

***40.6% per share***.  The Court approved the settlement and the Supreme Court of Delaware affirmed the judgment.[10]

28.     In 2002, Garcia and Sullivan took Ugly Duckling private and renamed it DriveTime.  Garcia II filled the DriveTime board with his friends, including Platt, who would later be awarded a seat on the Carvana board.

29.     Ten years later, in 2012, the Garcias created Carvana as an LLC subsidiary of DriveTime.  On November 1, 2014, DriveTime spun Carvana off as a separate company.  On November 29, 2016, Carvana was incorporated as a Delaware company; in April 2017, it went public, with its Class A shares trading on the NYSE at the price of $15 per share.

## B.     THE GARCIA PARTIES STRUCTURE CARVANA TO PERPETUATE THEIR CONTROL

30.     The Garcia Parties structured Carvana as an "up-C" (i.e., umbrella partnership) corporation.  As a result, the public corporation, Carvana Co., is a holding company the sole asset of which is the stock of its wholly owned subsidiary Carvana Co. Sub LLC ("Carvana Sub.").  In turn, the only assets held by Carvana Sub are the units ("LLC Units") of the operating entity Carvana Group, LLC ("Carvana Group").  Carvana Sub. is the sole manager of Carvana Group and operates and controls its business.  The diagram below depicts the Company's

---

[10] *Palmer v. Berger*, 806 A.2d 164 (Table) (Del. 2002).

organizational structure, which one *Seeking Alpha* commentator observed is "fiendishly complex".

DIAGRAM A:



31.     Carvana Group has two classes of LLC Units: Class A Units and Class B units.  Carvana is required to maintain a 4-to-5 ratio between the Class A shares issued by the Company and the number of Class A Units it owns.  In addition, it must maintain a 4-to-5 ratio between the Class B shares owned by LLC Unitholders and the number of Class A Units held by those LLC Unitholders.

32.     The purchase price for LLC units is 0.8 times the price of Class A shares.

33.     As part of the IPO, Carvana entered into an Exchange Agreement that permitted LLC Unitholders to exchange LLC Units for shares of Class A common stock (or, at the Company's election, for cash).[11]   In 2019, LLC Unitholders exchanged 5.1 million LLC Units and 3.1 million Class B shares for 4.3 million shares of Class A common stock.

34.     This "up-C" structure was designed by the Garcia Parties to protect the tax benefits of the existing owners at the time of the IPO while providing them liquidity options.   As a result of the up-C structure, Carvana—the publicly held company—holds a *minority stake* in the entity that actually operates the business and makes the money.[12]   The rest of the interest is held by persons—including the Garcia Parties—who own LLC Units in Carvana Group.   Because the Garcia Parties hold their economic interests mostly though the LLC, rather than the public company, their interests can conflict with those of the minority shareholders.

---

[11] Should an LLC Unitholder choose to exchange her Class A shares, she would be required to turn in Class B shares she held in an amount equal to the number of Class A shares she was receiving; the Class B shares would then be cancelled.  Thus, a Unitholder's voting power would be diminished in proportion to the number of LLC Units they ceded.

[12] Following the Offering, Carvana owns just 38% of the economic interest in Carvana Group.

15

C.   **DUAL CLASS SHARE SYSTEM SOLIDIFIES THE GARCIA PARTIES' CONTROL**

35.   The Garcia Parties set Carvana up with a dual-class stock structure. This ensured that they could maintain control over the business, even if they owned far less than half the economic interest in the Company and far less than a majority of total capital stock.

36.   Although Carvana's Class A shares are traded on NYSE, the Class B shares are not listed or traded on any stock exchange.  Instead, all of the Class B shares are held by LLC Unitholders.  As of February 21, 2020, there were 11 such shareholders.

37.   In almost all cases, shares of Class A and Class B common stock vote as a single class.  Each Class A share entities its holder to one vote.  Class B shares held by investors other than the Garcia Parties entitle their holders to one vote, as with Class A shares.  The Class B shares held by the Garcia Parties, however, entitle their holders to **_ten votes_** per share.[13]

38.   This "high-low" voting structure cemented the Garcia Parties' power to control the outcome of all decisions submitted to shareholders for a vote, including

---

[13] This 10-to-1 vote ratio is in place so long as the Garcia Parties beneficially own at least 25% of the outstanding Class A shares (determined on an as-exchanged basis assuming all of their Class A units were exchanged for Class A common stock).  At all times since Carvana's IPO, the Garcia Parties have held more than 25% of the outstanding Class A shares.

the election of directors and the "overall management and direction" of the Company. This is so despite the fact that the Garcia Parties own a minority of the economic interest in the Company. As the Company has acknowledged, the dual-class structure

> giv[es] the Garcia Parties the ability to control the outcome of matters requiring stockholder approval, even if they own significantly less than a majority of the shares of our outstanding Class A and Class B common stock, including the election of directors and significant corporate transactions, such as a merger or other sale of our company and its assets, and current investors, executives and employees with the ability to exercise significant influence over those matters.[14]

39.     The Company's SEC filings repeatedly acknowledge—as they must—that Carvana is a controlled company. As controllers,

> the Garcia Parties have the ability to elect all of the members of our Board and thereby control our policies and operations, including the appointment of management, future issuances of our Class A common stock or other securities, the payment of dividends, if any, on our Class A common stock, the incurrence of debt by us, amendments to our amended and restated certificate of incorporation and amended and restated bylaws, and the entering into of extraordinary transactions.

> In addition, the Garcia Parties can determine the outcome of all matters requiring stockholder approval, cause or prevent a change of control of our company or a change in the composition of our Board, and preclude any acquisition of our company.[15]

---

[14] Carvana Co., Prospectus Supplement (Form 424B2) at 15 (March 31, 2020) ("Private Offering Prospectus").

[15] *Id.* at S-4.

40.     In a particularly bold flouting of minority shareholders' interests, the Garcia Parties also immunized themselves from any internal prohibitions on related-party transactions.  Carvana's Amended and Restated Certificate of Incorporation ("Certificate of Incorporation") provides that the Garcia Parties have *no duty* to avoid usurping Carvana's corporate opportunities and that prohibitions on related-party transactions do not apply to them.[16]

41.     Although Carvana admits that it is a "controlled company," it purports to provide protections to stockholders.  For example, Carvana represents that it has an independent board.  That is not so.  As described more fully above, one of the directors, Garcia III, is part of the control group and is the son of the largest stockholder.   Three other directors have substantial ties to the Garcia family, including serving as funders of their entities, co-owning companies with them, and serving as executives and directors in the Garcia entities.

### D.     GARCIA II USES HIS CONTROL OVER CARVANA TO PROP UP DRIVETIME, PAYING IT MILLIONS OF DOLLARS EVERY YEAR IN NON-ARMS-LENGTH TRANSACTIONS

42.     Continuing the trend started at Ugly Duckling of using his controlled company for his personal enrichment, Garica II used Carvana to prop up DriveTime. DriveTime profits from a number of non-arm's-length arrangements with Carvana.

---

[16] *Id.* at S-5.

18

Among other things, DriveTime leases inspection and conditioning stations and other real estate to Carvana, contracts to repair vehicles for Carvana, services loans for Carvana, and even provides private planes for Carvana. Carvana paid DriveTime more than $5 million in 2019 for these services.[17]   Similarly, Carvana paid more than $2.8 million in 2019 to Verde, another entity controlled by Garcia II[18]. As DriveTime's sole stockholder, Garcia II benefitted from these arrangements. Given its close relationship to DriveTime, Carvana admits that it is "dependent on DriveTime for a number of important operations "[19] and, because of its historical reliance, would be "adversely affected" if DriveTime were unable or unwilling to continue to provide those services.[20]

---

[17] Carvana paid DriveTime about $2.5 million for expenses relating to leasing several car reconditioning centers; another $1.1 million for leasing a reconditioning center in Georgia; $800,000 for leasing office space and parking spaces at DriveTime facilities; $700,000 for a reconditioning center in Cleveland, $60,200 for rent relating to a reconditioning center in Nashville along with $2 million for leasehold improvements at the facility.  DriveTime also earned about $26.1 million in 2019 for serving as the servicer on various loan and finance receivables originating from Carvana.

[18] Carvana paid Verde $2.8 million relating to the lease of a reconditioning center other real estate in Arizona and $42,500 for one month's rent for a lease Verde assume in Tempe, Arizona.

[19] 2019 10-K at 19.

[20] 2019 10-K at 20.

**E.     CARVANA'S STOCK PRICE IS TEMPORARILY DEPRESSED AS A
RESULT OF THE PANDEMIC PANIC**

43.     In early 2020, stock prices tanked in the wake of the COVID-19 pandemic.  With the S&P and Dow indices delivering their worst March since the Great Depression, Carvana's stock plummeted:



44.     Although the COVID shock affected Carvana's shares, the fundamentals of the business were still sound, as the Garcias and other corporate insiders knew.   Indeed, Carvana offered its customers a unique competitive advantage that is particularly salient during the pandemic.  Carvana – unlike other auto dealers – allowed its customers to evaluate, finance, buy, and receive their new

vehicles without leaving their homes and thereby potentially exposing themselves to the COVID-19 virus.

45.     The Company highlights this valuable feature on its homepage:



46.     As Carvana boasts, it is a "SAFER WAY TO BUY OR TRADE A CAR." Carvana's "goal to give everyone a peace of mind—even during some of our most challenging times. . . . Now you can shop for your next car 100% online . . . . We'll even bring your car right to your driveway with **touchless delivery** to keep you safe."[21]

---

[21] Similarly, in a March 30, 2020 SEC filing, Carvana represented that it "believe[s] Carvana's online sales model, which allows customers to buy a car without ever coming into physical contact with another person, is the safest way to buy a car. . . . We believe it represents a significant step forward in the safety of retail auto sales

47.     As COVID concerns drove consumers to shelter in place, Carvana's touchless delivery poised the Company for continued growth.  While brick-and-mortar retail establishments were shuttering, Carvana experienced a 16% increase in its haulers' mileage from February to March.  On May 7, 2020, Carvana announced that it is nearly ***tripling*** its U.S. footprint, expanding its as-soon-as-next-day touchless delivery to 100 more markets.

48.     Garcia III touted COVID-19 as a major boon to his business, boasting: "Something's that's happened with this pandemic is that it's gotten many consumers who previously wouldn't have bought a car online to now buy it online."[22]  The Company's Q1 performance suggested that "Carvana has outperformed the industry quite significantly and grown our market share accordingly over this period," according to Garcia III.

49.     On May 6, 2020, commenting on the Company's Q1 2020 performance, Garcia III recognized that the public appreciated Carvana's approach and that its increase in sales was not just a blip:

> I think that in this new world, we now know the direction of a new
> customer preference, which is a preference for safety and minimizing
> unnecessary impact with other people that the customers don't know as
> well.  We know that that's likely to push demand in our direction and

in the current environment."  Carvana Co., Current Report (Form 8-K) at Item 7.01 (Mar. 30, 2020).

[22] Tina Bellon, *Used car deal Carvana expands as coronavirus fuels U.S. demand for online sales*, Reuters, May 7, 2020.

aid our goals increasing our market share. We don't' know how strong that impact will be. We don't know how persistent it will be, but it's pretty clear that's a directional impact. . . . We've made tremendous strides in the business. . . . We're in a really great spot.

50.    Data supported Garcia III's observations.  In early May, CarGurus published a survey in which it compared pre-pandemic buying attitudes to post-pandemic buying attitudes.  Before the pandemic, 32% of customers said they would consider buying a car online.  In early May, that number had almost doubled to 61%. "So, we do think that in this new environment, we have a very, very desirable offering," Garcia III commented. "I think across the economy, across different retail verticals and certainly in automotive, I think there seems to be a broadly held expectation that that [sic] e-commerce will be a relative outperformer during this time and coming out of this time. And I don't think that that's a secret."

51.    Garcia III's observations were made in connection with the Q1 earnings release, which took place the first week of May.  The financials confirmed Garcia III's observations:  Carvana announced its Q1 car sales were *up 43%* year-over-year and its revenue was *up 45%* year-over-year.  Although these results were released on May 6, 2020, Carvana insiders—including Garcia III, and by virtue of his access to Company books and records, Garcia II—would have been aware of the Company's performance in the quarter ending March 31, 2020.[23]

_____

[23] Importantly, the LLC agreement that governs the LLC Unitholders (e.g., Garcia II) and their relationship with Carvana and Carvana Group provides that unitholders

### F.   CARVANA ENTERS INTO A PRIVATE DEAL TO SELL SHARES TO CONTROLLERS ON THE CHEAP

52.   As Carvana's business (unbeknownst to the investing public) delivered strong growth, the Garcia positioned themselves to cash in.

53.   On March 30, 2020, Carvana announced that it was making a Registered Direct Offering ("RDO" or the "Private Offering") of 13.3 million Class A shares at $45 per share[24]  The RDO was not open to the public.  Instead, Carvana was selling shares to controllers—the Garcia Parties—and other confidential, handpicked investors, including (as discussed below) Garcia II's friend, Mark Walter.[25]  The Garcia Parties—who undoubtedly had access to the Company's books and records and knew of its strong performance in the face of the COVID pandemic—were able to grab big chunks of the Company on the cheap when they had material, nonpublic information about the Company's relatively strong performance.

---

"ha[ve] and may in the future receive certain confidential and proprietary information and trade secrets of the Company and its Subsidiaries . . . " Section 5.6, Unitholder Agreement.

[24] Carvana had filed a shelf registration statement in 2019, enabling the Company to sell registered shares in the future, requiring them only to file a prospectus supplement before the sale.

[25] Walter purchased his shares through an entity he owns and controls, CVAN Holdings, LLC, an LLC Unitholder.

54.     Carvana announced that it would offer 13,333,333 shares in the Private Offering.   Before the Private Offering, there were 50,602,132 Class A shares outstanding.  The Private Offering thus would increase the number of Class A shares by **_more than 25%_**.  Despite this massive expansion of the Class A class, none of these new shares would be offered to the broader public.  Instead, Garcia II (through his entity, Verde) would purchase $25 million of shares and Garcia III would purchase another $25 million.  With this purchase, Garcia III increased his Class A share holdings by **_more than 4,600%_**.  The Garcia Parties already controlled the Company primarily through their ownership of super-voting Class B shares; with the Offering, they grabbed more of the economic benefits of the Company at a cut-rate price.

55.     In addition to the Garcias, one of the substantial participants in the Private Offering was Walter, the billionaire buddy of Garcia II.  Through CVAN Holdings, LLC, which Walter controls, Walter purchased 400,000 shares in the Private Offering.  Because CVAN Holdings is an LLC Unitholder, Walter has access to non-public information about the performance of the Company.   The balance of the Private Offering shares were sold to a limited number of undisclosed investors.

56.     The $45 per share Private Offering price represented a substantial discount to Carvana's recent trading prices.  A $45 per share price equated to an 8.238% discount to Carvana's $49.04 closing price on March 27, 2020, the last

25

trading day before the offering was announced,[26] an 11.8% discount to the $51.02 average closing price for the five preceding trading days, and a 25.2% discount to the thirty-day volume weighted average share price of $60.19.

57.     Compounding the impact of pricing the Private Offering at a discount to Carvana's trading prices, the Private Offering took place when the stock's price was in an abysmal trough driven by COVID panic.  Indeed, on the last trading day before the pricing for the Private Offering was announced, Carvana's stock was trading near its lowest closing price in years:



---

[26] From certain investors' SEC Form 4 filings, it appears that the participants in the Private Offering executed an Investment Agreement with Carvana on or about March 28, 2020, pursuant to which they participated in the Private Offering.

58.     Given Carvana's stellar performance and strong balance sheet, the timing of the Private Offering is suspicious.  Carvana did **not** need to proceed with an equity raise at this time.  In fact, it admitted in its Prospectus Supplement that the net proceeds would be contributed to Carvana Sub, which would then acquire newly issued Class A Units in Carvana Group, which would use the funds for "general corporate purposes."  But Carvana could not specifically identify *which* corporate purposes it needed the funds for.  Indeed, as it admitted in its Prospectus Supplement, "At this time, we have not specifically identified a material single use for which we intend to use the net proceeds, and, accordingly, we are not able to allocate the net proceeds among any of these potential uses in light of the variety of factors that will impact how such net proceeds are ultimately utilized by us."

59.     Carvana suggested it would use the funds for the very vague and general purpose of "fund[ing] our operations and growth."  But Carvana was not having difficulty funding its operations and growth.  As described above, even during the COVID pandemic plunge, Carvana's sales and revenue increased in Q1[27] more than *40%* year-over-year.  In addition, the Company had *substantial* liquidity available to it.

---

[27] Because Q1 ended on March 31, 2020, before the Private Offering closed, none of the Q1 performance could be attributed to the use of proceeds of the Private Offering.

60.     It was clearly not necessary to proceed with the Private Offering at the *least advantageous* time for Carvana, which lost out on hundreds of millions of dollars in potential funds by jumping into a Private Offering at the stock's trough. Carvana should never have proceeded with an offering during the period in which the share price was so substantially—yet temporarily and artificially—affected by the pandemic plunge. By choosing to time the Private Offering in a manner that enriched the controlling shareholders, Carvana likely lost double-digits per share in potential proceeds, or hundreds of millions of dollars in total.

61.     The inequity of allowing the Garcias to buy Carvana stock in a *Private* Offering at $45 per share is particularly striking when juxtaposed against the price at which Carvana would make a *public* offering mere weeks later. On May 18, 2020, Carvana announced that it would proceed with a public offering of 5 million Class A shares (the "Public Offering"). In the Public Offering, Carvana sold shares to Citigroup Global Markets Inc. and Wells Fargo Securities, LLC, as underwriters, for *$92 per share*. Citigroup and Wells Fargo will expect to sell the shares at or near market price; Carvana closed at $94.74 on May 21, 2020. Instead of waiting for the stock price increase that would have predictably followed the Q1 earning announcement and offering more shares at $92 as part of the Public Offering, Carvana quickly acted at the time of the stock trough to deal 13 million shares to favored insiders at $45 a share in the Private Offering.

28

62.    Following the Public Offering, Carvana remained a minority holder in the operating entity, Carvana Group, holding just 38% of the economic rights.[28]  The other 62% is held by the other owners of Carvana Group, including the Garcia Parties.[29]

## G.    THE PRIVATE OFFERING WAS NOT ENTIRELY FAIR TO CARVANA

63.    The Private Offering was not entirely fair to Carvana.  It took place at the worst possible time for the Company and at a price lower than the share had traded in years in a "process" was designed to line the pockets of the Garcia family to Carvana's detriment.

### 1.    The Price Of The Private Offering Was Unfair

64.    The Company chose to announce and price the Private Offering when Carvana's stock was at its absolute lowest point in years.  Although the stock had been trading at above $100 a share in mid-February, Defendants chose to time a Private Offering—and price the Private Offering shares—when the stock was temporarily depressed because of the overall market sentiments.

65.    Like all retailers, Carvana's stock price was affected by the COVID-19 pandemic.  But Carvana (as the Garcia Parties knew) was uniquely positioned to

---

[28] Carvana's 38% interest comes through its indirect ownership (through Carvana Sub) of 79,749,357 Class A Units in Carvana Group.

[29] IPO Prospectus.

29

address growing customer demand in safer car-buying experiences and had experienced massive growth between February and March.  By providing a feature that allows customers to search for, compare, purchase, and receive their cars from the safety of their homes, Carvana addresses a growing market need for safety and security in the purchase of vehicles.  As a result, throughout the quarter, Carvana's stock price outperformed the auto industry as a whole, and even the S&P 500 index.

66.    The insiders—including the Garcia Parties—knew that the Company's fundamental strengths had not changed.  In recent years, Carvana had been experiencing rapid growth.  Its revenue had increased from $858.9 million in 2017 to $3.9 billion, a *4.5x increase in just two years*.

67.    Those with access to non-public information—like the Garcia Parties—understood that the fundamentals of the Company had not changed.  They knew that their Company was addressing a growing concern of the automobile-buying public. They also were aware that the Company had actually been performing relatively well during Q1, which ended March 31, 2019.

68.    Defendants also knew Carvana could have, and did, obtain flexibility with operational changes in response to COVID-19.  As Garcia III told investors *after* the Private Offering, these changes included "limiting capital expenditures" as well as operating expenses.  These changes left management "feeling really good

about our liquidity position even in deep stress scenarios because of those levers that we have in the business."

69.     Buying chunks of the Company's Class A shares at a discount certainly boosted the Garcia Parties' bottom lines.  Because the stock price swiftly recovered, the Garcia Parties reaped millions of additional gains:  Garcia II became $1.5 billion richer the first week of May alone, while Garcia III gained $700 million in that period.

70.     The unfairness of the Private Offering price is made stark by the fact that Carvana—little more than six weeks after the Private Offering—announced a Public Offering – at a ***much*** higher price.  Instead of a $45 share price (an 8.2% discount to the then-current share price), the offer price for the 5 million share public offering will be "at market prices prevailing at the time of sale, at prices related to such prevailing market prices or at negotiated prices."   On May 21, 2020, the Company sold the 5 million shares to the underwriters for a price of ***$92 each***— more than ***double*** what the Private Offering investors paid just weeks earlier.

## 2.     The Private Offering Was The Product Of An Unfair Process

71.     The grossly unfair price is little surprise considering the blatantly unfair process.  Despite the clear self-dealing involved—wherein the Garcia Parties profited handsomely from an ill-timed and massively unfair price—the Board did not take any steps to ensure even the appearance of a fair process.

31

72.     The Carvana Board was not independent.  The Company states that five of its six directors are independent, but this is not so.  Platt and Garcia II are friends and Platt served on DriveTime's board in the past.  Sullivan worked with and for Garcia II for years—landing them both in a fiduciary suit in this Court in 2000—and even took DriveTime public together.  Quayle is also not disinterested because his is friends with Garcia II, and both Garcia II and Garcia III have frequently contributed to the campaigns of Quayle and his son.  In addition, all of the directors are fully aware that Garcia II and Garcia III could have them removed at any time for any reason.

73.     Despite this blatant self-dealing and the lack of an independent Board, there is no suggestion in any of the Company's disclosures that the Board formed a Special Committee of any remaining independent directors to consider the highly conflicted Private Offering, nor is there any reference to any other special precautions taken to protect minority shareholders.

74.     There is also no indication that the Board engaged any independent firms to value the shares at or near the time of the Private Offering or to provide a fairness opinion concerning the economic fairness of the Private Offering to minority shareholders.

75.     There is no indication that anyone discussed the Q1 performance—of which they would already have had indications—before deciding on the offer price.

32

The insiders knew the Q1 results (or the approximate results) before the Private Offering. The quarter ended March 31 and the offering price was announced on March 31. The insiders would have known the revenue increased from $755.2 year-over-year to around $1.1 billion, a 45% increase. They likewise would have known that the Company's gross profits had skyrocketed to around $138 million, a 56.4% increase from the $88.5 gross profit gained in Q1 2019. Even the number of units sold had improved, from 36,766 in the first quarter of 2019 to 52,427, a 42.6% increase. Assuming the exact figures for the entire quarter were not yet known on March 31, nevertheless it is likely that the insiders had an indication of what the results would look like.

76.     Rather than put in place protections to ensure that the Private Offering was fair to the Company, the Board negotiated a price with its own controllers and with other, confidential investors that served *their* interest: a bigger piece of the Carvana pie at a remarkable discount.

77.     In short, the Board stepped aside and allowed Carvana to be abused by the self-dealing Garcia Parties to reap millions of dollars. The Board apparently did nothing to protect Carvana's interests in a transaction rife with self-dealing, or to ensure that the Private Offering approximated arms-length transactions. Rather, the Board authorized a Private Offering at a bargain-basement price, foregoing significant capital, and choosing the method of obtaining liquidity that was poorly

timed and unfairly executed.   In addition, the Company incurred substantial professional fees and other transaction costs, and hampered its ability to tap public markets in the future to raise money. Meanwhile, the controllers received a windfall.

78.    Accordingly, the Private Offering involved self-dealing transaction that did not receive approval from an independent board, and that concerned a self-dealing transaction with controlling shareholders on both sides of the transaction.  It appears that absolutely no mechanisms were employed to provide the equivalent of arm's-length bargaining; rather, the process of deciding upon and proceeding with the Private Offering was grossly unfair.

### H.    THE PRIVATE OFFERING CAUSED SUBSTANTIAL HARM TO CARVANA

79.    Defendants caused Carvana to lose a significant amount of money by proceeding with the Private Offering when and in the manner that they did.

80.    Carvana suffered the loss of the proceeds of the Private Offering in an amount equal to the difference between the offered price of $45.00, and the price of a share at a more reasonable time for an offering, e.g., the price of the Public Offering only a month later when the share price was averaging above $95.00.

## II.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

81.    Plaintiffs bring this suit derivatively on behalf of Carvana to redress breaches of fiduciary duty and other equitable claims.

82.     The Demand Board consists of the six Director Defendants:  Garcia III, Michael Maroone, Ira Platt, Greg Sullivan, Dan Quayle, and Neha Parikh.

### A.     AT LEAST FOUR BOARD MEMBERS CANNOT IMPARTIALLY CONSIDER A DEMAND BECAUSE OF THEIR RELATIONSHIPS WITH THE GARCIA PARTIES

83.     Garcia III, Sullivan, Platt, and Quayle cannot impartially consider a stockholder demand because of their interest in the subject transaction and/or their relationships with the Garcias.

84.     Garcia III was clearly interested in the Private Offering because he received a benefit not available to the minority stockholders:  a significant number of Class A shares for purchase at a steep discount.  In addition, his father is Carvana's largest shareholder, and, together with his father, Garcia III controls the Company.

85.     Sullivan has worked for, and side-by-side with, Garcia II for more than two decades, serving in a variety of positions for Garcia II's auto business from no later than 1999 until at least 2007.   Sullivan joined Garcia II in a bid to take Ugly Duckling private in October 2000, after which Sullivan was to receive 20% of the company.  In the April 2001 renewed bid to take the company private, Garcia had arranged for Sullivan to receive an option to purchase 20% of the acquiring company.  Both Sullivan and Garcia II were sued together in this Court for breaches of fiduciary duty in relation to several related-party transactions involving Ugly Duckling, including with respect to the take-private deal.  Sullivan's exposure in that

case turned on the willingness of Garcia II to settle the suit and to indemnify him for his costs.  Given his longstanding relationship and financial entanglements with Garcia II, Sullivan cannot impartially consider a demand.

86.     Platt is also not disinterested or independent of the Garcias.  GV Auto I LLC, which he controls, is a substantial unitholder in Carvana Group.  In addition, Garcia II and Platt are close, and Garcia II appointed Platt to the board of DriveTime, a company founded and owned by Garcia II.  Platt served as a DriveTime director from February 2014 until he was traded over onto the Carvana board at the time of Carvana's IPO.  Under these circumstances, Platt cannot impartially consider a demand.

87.     Quayle, too, is not independent.  He is personal friends with Garcia II. The Garcias have donated to his campaigns and those of his son to the maximum amount allowed by law.  From his options and RSUs provided to him for just two years of service as a director, Quayle made millions of dollars.[30]  Under these circumstances, Quayle cannot impartially consider a demand.

88.     Each of Maroone, Sullivan, Platt, Quayle, and Parikh know they are entirely dependent on the good will of the Garcia Parties for their directorships. They are aware that they could each be removed—without cause—simply if the

---

[30] Ed Lin, *Vice President Dan Quayle Has Made a Bundle From a Used-Car Company*, Barron's (Apr. 24, 2019).

Garcia Parties wish it.  They also know that the Garcia Parties can ensure that any corporate action they wish will be taken.  The Prospectus Supplement acknowledges this, indicating that the Garcia Parties control a variety of decisions, including the issuance of Cass A common stock, amendments to the certificate of incorporate and bylaws.   The Director Defendants know that, even if they wanted to stop a corporate action, they would at most be nothing more than a momentary speed bump.

## B.   EACH OF THE DIRECTOR DEFENDANTS IS CONFLICTED BECAUSE THEY EACH FACE A SUBSTANTIAL RISK OF LIABILITY

89.     Each of the Director Defendants was on the Company's Board at the time of the Private Offering.  Indeed, all of the Director Defendants—except Parikh, who joined in 2019—has been on the Board since the IPO.

90.     Carvana's Amended and Restated Certificate of Incorporation authorizes only the Board of Directors to issue shares of Class A common stock, on terms and conditions established by the Board in its sole discretion.  It was therefore the responsibility of the Board to authorize the Private Offering and its timing.

91.     Each of the Director Defendants was aware that the price of Carvana's stock price was far below where it had been just weeks earlier, and substantially lower than the average share price in 2019.  Each of the Director Defendants also knew that the Company had adequate liquidity.  They also knew that the Company's performance—in terms of both revenue and car sales—was actually improving over the period year.  They also knew that Carvana offered a particular competitive

advantage that placed in it an enviable position during the pandemic crisis vis-à-vis other auto retailers.  Each of the Director Defendants was also aware that the Garcia Parties would significantly benefit from the Private Offering at such a low price.

92.     Each of the Director Defendants had an undivided duty of loyalty to Carvana, which required them to advance the Company's best interests and to place those interests ahead of the interests of others (including the Garcia Parties) especially when such interests conflict, as they did here.  The Director Defendants were required to make decisions concerning capital raises that were based on the best interests of the Company and the stockholders, and to come to those decisions after a good faith, fair process.

93.     Instead of advancing the interests of Carvana, the Director Defendants favored the interests of the Garcia Parties and other hand-picked investors by selecting the time for a Private Offering that was *most* advantageous to the Private Offering participants and *least* advantageous to Carvana.  They chose a means of raising capital that preserved all of the benefits of a bargain-basement price for the Garcia Parties and other Private Offering participants.  In doing so, the Director Defendants robbed Carvana of potentially hundreds of millions of dollars of value.

94.     The Director Defendants—by favoring the Garcia Parties over the Company—disregarded their duty of loyalty consciously and in bad faith.  Thus,

38

each of the Director Defendants faces a substantial risk of personal liability in connection with his approval of the Private Offering.

95.    For each these reasons, a demand on the current Board would be futile and is therefore excused.

## COUNT I

### Breach of Fiduciary Duty
### (Derivatively on behalf of Carvana against
### The Garcia Parties)

96.    Plaintiffs repeat and reallege the paragraphs above as if fully set forth herein.

97.    As members of a control group, the Garcia Parties owed and continue to owe to Carvana and its other stockholders fiduciary duties.

98.    Garcia II also owed fiduciary duties as a director and officer of the Company.

99.    The Garcia Parties violated their fiduciary duty of loyalty by putting their own interests ahead of the interests of Carvana by proceeding with, approving, and profiting from, the Private Offering.  They caused the Company to sell a substantial number of shares at a bargain-basement price, which profited them at the expense of the Company.

100.   The Private Offering was not entirely fair to Carvana.

101.   As a result of the Garcia Parties' breaches of fiduciary duty, Carvana has been harmed and continues to be harmed.

102.   Neither Plaintiffs nor the Company have an adequate remedy at law.

## COUNT II

### Breach of Fiduciary Duty
### (Derivatively on behalf of Carvana
### against the Director Defendants)

103.   Plaintiffs repeat and reallege the paragraphs above as if fully set forth herein.

104.   The Director Defendants owed and continue to owe fiduciary duties to Carvana. The Director Defendants breached their fiduciary duties by approving athe Price Offering of Class A shares to controllers and other private investors at a bargain-basement price. The Director Defendants' decision to engage in the Private Offering served only the controllers' interest in obtaining a larger degree of the equity interest in the Company at an artificial, heavily discounted price. Their actions disregarded Carvana's interest in maximizing the amount of proceeds the Company obtained in exchange for its shares. Instead, Board loyalists bent to controllers' pressure and bestowed a trove of valuable shares on them far below what the shares were actually worth.

105.   Garcia III owed Carvana fiduciary duties of loyalty and care. As the CEO of the Company, his task was to maximize profits for the Company. Instead,

40

he engaged in a self-dealing giveaway, designing a Private Offering that was available only to himself, his father, affiliates of his family, friends, and a limited number of other investors. Garcia II failed to ensure that the Company obtained a fair price for the Class A shares or, to the extent necessary, to delay the Private Offering until such time as the Company could obtain more competitive prices from other investors.

106.   The Private Offering was not entirely fair to Carvana.

107.   As a result of the Director Defendants' breaches of fiduciary duty, Carvana has been harmed and continues to be harmed.

108.   Plaintiffs and the Company have no adequate remedy at law.

## COUNT III

### Breach of Fiduciary Duty / *Brophy* Claim
### (Derivatively Against Insider Trading Parties)

109.   Plaintiffs repeat and reallege the paragraphs above as if fully set forth herein.

110.   The Insider Trading Defendants purchased Class A stock when they knew the price of that stock was temporarily and artificially depressed as a result of the market-wide price plunge caused by the COVID pandemic.

111.   At the time they purchased such stock, they had knowledge of the general performance of the Company during Q1. This information included, but was

41

not limited to, the fact that the Company's revenue and sales growth were not only healthy but experiencing increases of more than 40% year-over-year in Q1.

112.  The information to which the Garcia Parties had access was material, non-public information.  This information was available to and was relied upon by the Insider Trading Defendants when they chose to cause the Private Offering to occur when it did, at the price it did, and when they participated in it.

113.  The material, nonpublic information concerned the Company's performance during the Q1 and its expected performance in the near future.  This information regarded the Company's business and financial condition and was not known or knowable to the general investing public.

114.  The Insider Trading Defendants used the Company's own information to profit for their own gain before the public was made aware of the material non-public information.  This profit constitutes a breach of the Insider Trading Defendants' fiduciary duties, on which the Company is entitled to impose a constructive trust and to require the disgorgement of any additional profits obtained thereby.

115.  Plaintiffs and the Company have no adequate remedy at law.

## COUNT IV

### Waste
### (Derivatively Against the Director Defendants)

116.   Plaintiffs repeat and reallege the paragraphs above as if fully set forth herein.

117.   The Director Defendants, whose responsibility it was to manage the business corporate affairs of the Company, were entrusted with the duty of managing the property of the Company, loyally with due care and in the best interests of the stockholders.

118.   By authorizing and/or acquiescing to the Private Offering at terms highly favorable to the Company's controllers but at a price that was grossly unfair to Carvana, the Director Defendants' conduct constituted a waste of corporate assets. The decision to enter into the Private Offering was tainted by conflict of interest and bad faith.  The Director Defendants have violated their duties of loyalty, due care, and diligence.

119.   As a direct and proximate result of Direct Defendants' waste of corporate asset as alleged herein, Carvana has sustained damages.

120.   Plaintiffs and Carvana have no adequate remedy at law.

43

## COUNT V

### Unjust Enrichment
### (Derivatively Against Garcia Parties)

121. Plaintiffs repeat and reallege the paragraphs above as if fully set forth herein.

122. The Garcia Parties received (and welcomed) a substantial benefit as a result of the Private Offering, which they approved. They obtained more than 100,000 Class A shares at a bargain-basement price. They saved these substantial amounts by participating in a Private Offering they knew was unfair.

123. There was no rational business justification or purpose for proceeding with the Private Offering when and in the manner chosen by the Garcia Parties.

124. Carvana has been harmed by issuing more than 13 million shares at a heavily discounted price.

125. Plaintiffs and the Company have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.      Declaring that demand on the Board would be excused as futile;

B.      Declaring that Defendants breached their fiduciary duties of loyalty and care;

C.      Entering judgment against Defendants for breaching their respective fiduciary duties of loyalty as directors, officers, controlling stockholder entities, and/or human controllers of controlling stockholder entities;

D.      Ordering all Defendants to repay Carvana the amount of each of the Defendant's respective unjust enrichment in restitution;

E.      Granting appropriate equitable relief to remedy Defendants' breaches of fiduciary duty;

F.      Ordering the Insider Trading Defendants to disgorge all proceeds received in connection with the Private Offering;

G.      Awarding damages against Defendants for breaching their fiduciary duties of loyalty and good faith to Carvana in connection with the Private Offering;

H.      Awarding Carvana damages it sustained as a result of Defendants' breaches of fiduciary duty;

I.      Awarding pre-judgment and post-judgment interest at the maximum rate permitted by law or equity;

J.      Awarding Plaintiffs their reasonable attorneys' fees, expenses, and costs; and

K.      Granting such other and further relief as the Court deems just and equitable.

Dated: May  28, 2020

**GRANT & EISENHOFER, P.A.**

By: */s/ Michael J. Barry*
      Michael J. Barry (#4368)
      Christine M. Mackintosh (#5085)
      Rebecca A. Musarra (#6062)
      123 Justison Street
      Wilmington, DE 19801
      (302) 622-7000

      *Counsel for Plaintiffs*